IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
GREENVILLE DIVISION

| | | |
|---|---|---|
| Allstate Indemnity Company, | ) | |
| | ) | |
| Plaintiff, | ) | Civil Action No. 6:19-cv-2273-TMC |
| | ) | |
| vs. | ) | |
| | ) | |
| Lydia Riley, individually and as | ) | **ORDER** |
| Personal Representative of the Estate | ) | |
| of Rhoda Ann Clark; David Riley; and | ) | |
| Julie Lyn Kuhn, as parent and natural | ) | |
| guardian of W.W.K., a minor, | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |
| _____ | ) | |

This declaratory judgment action arises out of a personal injury lawsuit currently pending

in the Court of Common Pleas for Greenville County, South Carolina (the "Underlying Action"),

brought by Defendant Julie Lyn Kuhn ("Kuhn"), as parent and natural guardian of W.W.K., a

minor, against Defendants Lydia Riley ("Lydia"), individually and as the Personal Representative

of the Estate of Rhoda Ann Clark ("Clark" or the "Estate") and David Riley ("David"). *See Kuhn*

*et al. v. Riley et al.*, No. 2019CP2303134, Greenville County Thirteenth Judicial Circuit Public

Index, https://www2.greenvillecounty.org/SCJD/PublicIndex/PISearch.aspx (last visited Nov. 17,

2020).[1]  Plaintiff Allstate Indemnity Company ("Allstate") is currently providing a defense for the

Estate, Lydia, and David in connection with the Underlying Lawsuit under a reservation of rights

pursuant to a homeowners' insurance policy issued by Allstate to Clark.  (ECF No. 1 at 4).  On

---

[1] The court takes judicial notice of the state court records related to the Underlying Action.  *See Philips v. Pitt Cty. Mem'l Hosp.*, 572 F.3d 176, 180 (4th Cir. 2009) (noting a court "may properly take judicial notice of matters of public record"); *Colonial Penn Ins. Co. v. Coil*, 887 F.2d 1236, 1239 (4th Cir. 1989) ("We note that 'the most frequent use of judicial notice of ascertainable facts is in noticing the content of court records.'" (internal alterations and citations omitted)).

August 13, 2019, Allstate brought this action against Defendants seeking to have the court

determine the rights of the parties under the Policy and to declare whether Allstate has a duty to

defend or indemnify the Estate, Lydia, or David for the claims asserted by Kuhn in the Underlying

Action. *Id*. at 12.

On May 20, 2020, Allstate moved for summary judgment as to all claims. (ECF No. 32).

Defendants filed a joint response in opposition on June 23, 2020, (ECF No. 37), and Allstate

replied, (ECF No. 41). Accordingly, this matter is now ripe for review. After carefully reviewing

the record and the submissions of the parties, the court concludes a hearing is unnecessary to decide

this matter. For the reasons set forth below, the court grants summary judgment in favor of

Allstate.

## BACKGROUND

The material facts in this case, as set forth herein, are undisputed. Clark owned a home

located at 36 Hillside Circle, Greenville, SC 29607 (the "Home"), where she resided with her

daughter, Lydia, and Lydia's four children, including David. *See* (ECF Nos. 32-1 at 2, 7, 9; 32-4

at 2–3; 32-11 at 2; 37 at 1). In January 2016, Lydia began babysitting children and providing

daycare services in the Home in order to supplement her income. (ECF No. 32-3 at 6–8). Although

she did not obtain a business license to operate a daycare facility in the Home, Lydia did obtain

her certification as a Home Supports Caregiver to work with children with special needs through

the Greenville County Disabilities and Special Needs Board. *Id*. at 23–25. Lydia placed an

advertisement on Craigslist.com indicating she was looking to care for a few children, aged infants

to toddlers, in the Home between 8:00 a.m. to 4:00 p.m. at a rate of $5.00 per hour per child. (*Id*.

at 6–7, 32). She also created written policies and procedures under the name "Lydia Riley's Family

Services," which she provided to the parents of the children she babysat. *Id*. at 8–9, 33. Pursuant

to the policies and procedures, payment for weekday care was due on Friday or the last day that care would be provided for the week, and payment for weekend care was due upon arrival. *Id*. at 33. Evening meals were available to the children for an additional $4.00 per child, and, if a parent was late picking up their child, an additional fee of $2.00 was added every ten minutes beyond the agreed-upon pick-up time. *Id*. Any late payment resulted "no childcare being provided the following week and subsequent childcare [would] only continue once full payment [was] made, along with a $10 Late Payment Fee." *Id*.

Lydia estimates that, from January 2016 through August 2016, she made between $600.00 and $900.00 dollars per week through her babysitting activities. (ECF No. 32-4 at 6). On her 2016 taxes, Lydia filed a Schedule C Profit or Loss from Business, reporting gross income of $12,713.00 from her "child care" business. (ECF Nos. 32-3 at 10, 41; 32-5). Lydia also reported the following expenses associated with her child-care business: car and truck expenses; legal and professional services; office expenses; repairs and maintenance; supplies; utilities; and wages. (ECF Nos. 32-3 at 41; 32-5). Additionally, Lydia filed a Federal Schedule C Depreciation Schedule and an Alternative Minimum Tax Depreciation Report claiming depreciation of her vehicle related to her child-care business. (ECF Nos. 32-6; 32-7).

Kuhn found Lydia's advertisement for child-care services on Craigslist.com and, in February of 2016, hired Lydia to babysit her minor son, W.W.K, while she was at work. (ECF Nos. 32-8 at 2–3; 32-9 at 2). Due to Kuhn's long hours, Lydia agreed to charge her a flat rate to watch W.W.K., which Kuhn paid once a week. (ECF No. 32-8 at 5). According to Lydia's deposition testimony, she babysat W.W.K. anywhere from 60 to 150 hours a week. *See* (ECF No. 32-3 at 14–16).

**August 1, 2016 Incident**

Lydia's son, David, has lived at the Home with Clark and Lydia since he was four years old. (ECF No. 32-11 at 2). In the spring of 2015, David graduated from high school and, that fall, began attending college in Santa Clara, California. *Id*. at 3. After his first semester, he returned to the Home for Christmas break. *Id*. While he was home, he bought a handgun from a friend to use for "personal reasons, self-protection." *Id*. at 6. When he left to go back to California for his second semester in January 2016, David left the handgun on top of a grandfather clock in the living room of the Home. *Id* at 9; (ECF No. 32-3 at 2). David returned to the Home after his second semester, in the summer of 2016, at which point he retrieved the gun. (ECF No. 32-11 at 5, 9); *see also* (ECF No. 32-3 at 2). Typically, whenever he left the home, David would take the gun with him and leave it in a locked compartment in his vehicle. (ECF Nos. 32-3 at 2; 32-11 at 7, 9). While he was at home, he would wear the gun in a holster or leave it in his bedroom on an ottoman or his bedside table. (ECF Nos. 32-2 at 3; 32-11 at 10).

On the evening of July 31, 2016, Lydia was at the hospital with Clark and David was at Home with two of his sisters. *See* (ECF No. 32-11 at 11). David decided to visit a friend's house and, because there had been "several incidents" in their neighborhood the week before, David decided to leave his gun with his sisters in case they needed it and hid it "under the greenery" on their counter-height kitchen table. *Id*. at 10–11; *see also* (ECF No. 32-3 at 30 (describing that gun was "on a counter-height table in the middle, underneath greenery . . . in the kitchen")). David did not return to the Home until late that night and went straight to bed, leaving the gun where it was hidden on the kitchen table. (ECF No. 32-11 at 11).

The next morning, Monday, August 1, 2016, David woke up early and went to work, again forgetting to take or move his gun. *Id*. That day, Lydia was babysitting W.W.K. and another child

4

at the Home and brought them with her to go grocery shopping. *See* (ECF No. 32-3 at 18, 26–28). When they returned to the Home, the children were helping Lydia bring the groceries into the house. *Id*. at 28. While Lydia was outside, W.W.K. was setting groceries on the kitchen table when he found David's gun and accidentally shot himself in the hand. *See* (ECF Nos. 32-3 at 27–30; 32-8 at 7; 32-9 at 1; 32-10 at 3; 32-11 at 11; 32-13; 32-14).

The Greenville Police Department and the South Carolina Department of Social Services ("DSS") both conducted investigations into the incident, during which Lydia agree to stop providing child-care services out of the Home. *See* (ECF Nos. 32-9 (Kuhn's police report); 32-12 (DSS's On-Site Visit Report and Deficiency Citation); 32-13 (Crime Scene Investigation Report); 32-14 (Indictment charging Lydia with "Children/Legal custodian, unlawful neglect of child"); 32-15 (DSS letter to Lydia noting she has been placed on the South Carolina Central Registry of Child Abuse and Neglect and denying her request for an administrative hearing)). Consequently, DSS placed Lydia's name on the South Carolina Central Registry of Child Abuse and Neglect, (ECF Nos. 32-1 at 9; 32-12; 32-15), and Lydia was criminally charged with unlawful neglect of a child in violation of Greenville County Ordinance § 63-05-0070, (ECF Nos. 32-3 at 4–5; 32-14). In exchange for Lydia's participation in and completion of the Pre-Trial Intervention Program ("PTI")—a diversion program for non-violent criminal offenders requiring community service, individual or group counseling, and payment of restitution—the criminal charges against her were expunged. (ECF Nos. 32-1 at 10, 10 n.5; 32-3 at 4–5).

**Underlying Action**

On May 31, 2019, Kuhn commenced the Underlying Action against Lydia, David, and the Estate, seeking to recover damages for the injuries W.W.K. sustained while in Lydia's care at the Home. *See Kuhn*, No. 2019CP2303134, Greenville County Public Index; (ECF No. 32-2). The

Second Amended Complaint (the "Complaint") asserts that, on August 1, 2016, Clark owned the

Home and both Lydia and David resided there.  (ECF No. 32-2 at 1–2).  Additionally, the

Complaint asserts that both Clark and Lydia were aware that David owned and kept a loaded

firearm in the Home.  *Id*. at 2.  The Complaint alleges that, on August 1, 2016, W.W.K. "was an

invitee [at the Home] . . . in the care, custody, and control of [Lydia], who was babysitting [him,]"

when he "discovered the loaded firearm and unwittingly discharged the firearm causing significant

and severe injury to his left hand."  *Id*.  In particular, Kuhn alleges that Lydia, David, and the

Estate were negligent, reckless, and grossly negligent:

> a) In allowing a loaded firearm to be present in [their] home in close proximity to [W.W.K.];
>
> b) In failing to keep the firearm under lock and key and out of the reach of [W.W.K.];
>
> c) In keeping a firearm loaded with ammunition when not in use in the home while knowingly allowing minor children as invitees on the premises;
>
> d) In *failing to adequately and properly supervise [W.W.K.]* while he was in the [H]ome;
>
> e) In failing to prevent the firearm from being brought into the home when [they] knew or should have known the firearm was likely to be left in a place where [W.W.K.] could find it;
>
> f) In failing to disclose to and warn . . . Kuhn of the existence of the firearm in the home;
>
> g) In *failing to adequately protect [W.W.K.] from harm* relating to the presence of the firearm; and
>
> h) In failing to act as a reasonable and prudent homeowner and/or residents of the home under the circumstances there and then existing.

*Id*.at 2–3 (emphasis added).  As a result of these actions, Kuhn asserts that W.W.K. suffered

serious, painful injuries and scarring to his left hand, necessitating multiple surgeries and

treatment, as well as emotional injuries.  *Id*. at 3.

### The Allstate Homeowners Insurance Policy

Allstate issued a homeowners' insurance policy, Number 955 211 821, to Clark as the named insured covering the Home for the period of May 12, 2016 through May 12, 2017 (the "Policy"). (ECF No. 32-3 at 42–94). According to the declarations page, the Policy limit for Family Liability Protection is $300,000.00 per occurrence, and the limit for Guest Medical Protection is $1,000 for each person. *Id*. at 46. The declarations page also identifies other available coverages that were not purchased, including Home Day Care coverage. *Id*.; *see also id*. at 12. Section II of the Policy set forth the coverage for Family Liability Protection and Guest Medical Protection, and provides in pertinent part:

> **Coverage X**
> **Family Liability Protection**
>
> **Losses We Cover Under Coverage X:**
> Subject to the terms, conditions and limitations of this policy, **Allstate** will pay damages which an **insured person** becomes legally obligated to pay because of **bodily injury** or **property damage** arising from an **occurrence** to which this policy applies, and is covered by this part of the policy. . . .
>
> **Losses We Do Not Cover Under Coverage X:**
> 1. **We** do not cover any **bodily injury** or **property damage** intended by, or *which may reasonably be expected to result from* the intentional or *criminal acts* or omissions of, any **insured person**. . . . *This exclusion applies regardless of whether or not such insured person is actually charged with, or convicted of a crime*. . . .
> 12. **We** do not cover **bodily injury** or **property damage** *arising out of the past or present* **business** *activities* of an **insured person**.

*Id*. at 78–79 (bolded emphasis in original; italic emphasis added).

The Policy also defines the following:

> **Definitions Used In This Policy**
> 1. "**You**" or "**your**"—means the person named on the Policy Declarations as the insured and that person's resident spouse.

2. "**Allstate**," "**we**," "**us**," or "**our**"—means the company named on the Policy Declarations.

3. "**Insured person(s)**"—means **you** and, if a resident of **your** household: a) any relative; and b) any dependent person in **your** care. . . .

6. "**Business**"—means: a) any full or part-time activity of any kind engaged in for economic gain including the use of any part of any premises for such purposes. *The providing of home day care services to other than an **insured person** or relative of an **insured person** for economic gain is also a **business**. . . .*

9. "**Occurrence**"—means an accident, including continuous or repeated exposure to substantially the same general harmful conditions during the policy period, resulting in **bodily injury** or **property damage**.

*Id*. at 61–62 (emphasis added).  Finally, the Policy contains a Joint Obligations provision which provides that "the responsibilities, acts and failures to act of a person defined as an **insured person** will be binding upon another person defined as an **insured person**."  *Id*. at 63.

## STANDARD OF REVIEW

Summary judgment is appropriate only if the moving party "shows that there is no genuine dispute as to any material fact and the [moving party] is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  A party may support or refute that a material fact is not disputed by "citing to particular parts of materials in the record" or by "showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact."  Fed. R. Civ. P. 56(c)(1).  Rule 56 mandates entry of summary judgment "'against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial.'"  *Phillips v. Nlyte Software Am. Ltd*., 615 Fed. App'x 151, 152 (4th Cir. 2015) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986)).

"'In determining whether a genuine issue has been raised, the court must construe all inferences and ambiguities in favor of the nonmoving party.'"  *Sellers v. Keller Unlimited LLC*,

8

388 F. Supp. 3d 646, 649 (D.S.C. 2019) (quoting *HealthSouth Rehab. Hosp. v. Am. Nat'l Red Cross*, 101 F.3d 1005, 1008 (4th Cir. 1996)).  However, "'[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment.  Factual disputes that are irrelevant or unnecessary will not be counted.'"  *McKinney v. G4S Gov't Sols., Inc*., 711 Fed. App'x 130, 134 (4th Cir. 2017) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).  The moving party has the burden of proving that summary judgment is appropriate.  *Bd. of Trs., Sheet Metal Workers' Nat'l Pension Fund v. Lane & Roderick, Inc*., 736 Fed. App'x 400, 400 (4th Cir. 2018) (citing *Celotex Corp.*, 477 U.S. at 322–23).  Once the moving party makes this showing, however, the opposing party may not rest upon mere allegations or denials, but rather must, by affidavits or other means permitted by the Rule, set forth specific facts showing that there is a genuine issue for trial.  *See* Fed. R. Civ. P. 56(c), (e); *Humphreys & Partners Architects, L.P. v. Lessard Design, Inc*., 790 F.3d 532, 540 (4th Cir. 2015).

## DISCUSSION

In its motion for summary judgment, Allstate argues (1) that the criminal acts and business activity exclusions in the Policy preclude Guest Medical Protection Coverage for the damages claimed in the Underlying Action; (2) that the criminal acts and business activity exclusions bar Family Liability Protection Coverage as to Lydia; and (3) that, because Lydia's actions exclude her from coverage, the Joint Obligations Provision operates to bar Family Liability Protection Coverage for David and the Estate as well.  *See* (ECF Nos. 32-1; 41).  In response, Defendants assert that summary judgment for Allstate is improper because (1) the business activities exclusions do not preclude coverage of the claims raised in the Underlying Action; (2) a material question of fact exists as to what constitutes a "criminal act;" and (3) the Joint Obligations

9

Provision, if enforced against David, would render the Policy illusory in violation of South Carolina law and public policy. *See* (ECF No. 37 at 4–12).

Under South Carolina law,[2] "[a]n insurance policy is a contract between the insured and the insurance company, and the terms of the policy are to be construed according to contract law." *Auto Owners Ins. Co. v. Rollison*, 378 S.C. 600, 606, 663 S.E.2d 484, 487 (2008).  As such, insurance policies are subject to the general rules of contract construction and the court must give the policy language its plain, ordinary, and popular meaning.  *Bell v. Progressive Direct Ins. Co.*, 407 S.C. 565, 579, 757 S.E.2d 399, 406 (2014).  "An insurance policy is to be liberally construed in favor of the insured[,]" *Am. Credit of Sumter, Inc. v. Nationwide Mut. Ins. Co.*, 378 S.C. 623, 628–29, 663 S.E.2d 492, 495 (2008), and "policy exclusions are construed most strongly against the insurance company, which also bears the burden of establishing the exclusion's applicability," *Owners Ins. Co. v. Clayton*, 364 S.C. 555, 560, 614 S.E.2d 611, 614 (2005).  Nevertheless, the obligation of the insurer under an insurance policy "is defined by the terms of the policy itself and cannot be enlarged by judicial construction." *S.C. Farm Bureau Mut. Ins. Co. v. Wilson*, 344 S.C. 525, 530, 544 S.E.2d 848, 850 (Ct. App. 2001).  Indeed, it is well settled that "courts have no authority to torture the meaning of policy language to extend or defeat coverage that was never intended by the parties."  *Diamond State Ins. Co. v. Homestead Indus., Ins.*, 318 S.C. 231, 236, 456 S.E.2d 912, 915 (1995) (citing *Torrington Co. v. Aetna Cas. & Sur. Co.*, 264 S.C. 636, 643, 216 S.E.2d 547, 550 (1975)).  Further, "[w]here the terms of a contract are clear and unambiguous as a matter of law, its construction is for the court."  *Black v. Freeman*, 274 S.C. 272, 273, 262 S.E.2d 879, 880 (1980).

---

[2] A federal district court sitting in diversity must apply the substantive law of the state in which the court sits, *Erie R.R. Co. v. Tompkins*, 304 U.S. 64, 79 (1938), and in this case, the parties do not dispute that South Carolina law applies.

**I.     The Policy's Business Activity Exclusion Precludes Coverage for the Claims Asserted in the Underlying Lawsuit.**

*A.   The Claims in the Underlying Lawsuit "Arise Out Of" Lydia's Child Care Business.*

As noted above, the Policy provides liability protection coverage for "damages which an insured person becomes legally obligated to pay because of bodily injury . . . arising from an occurrence to which this policy applies[.]"   (ECF No. 32-3 at 78).   However, this coverage expressly excludes "bodily injury . . . *arising out of* the past or present business activities of an insured person."   *Id*. at 79 (emphasis added).   While the parties agree that Lydia's "babysitting services" constitute a business as defined in the Policy, *see* (ECF No. 37 at 4), they disagree as to whether W.W.K.'s injuries and the claims raised in the Underlying Action "arose out of" said business activity, *compare id*. at 4–6, *with* (ECF Nos. 32-1 at 24–25, 32–34; 41 at 4–7).

The South Carolina Supreme Court has not addressed the scope of the phrase "arising out of" in the specific context of a business activities exclusion in a homeowners insurance policy. However, in *McPherson v. Michigan Mutual Insurance Company*, 310 S.C. 316, 426 S.E.2d 770 (1993), the South Carolina Supreme Court held that, "for the purpose of construing an exclusionary clause in a general liability policy, 'arising out of' should be narrowly construed as 'caused by.'" *Id*. at 320, 426 S.E.2d at 771 (interpreting exclusion for "injuries arising out of the ownership, operation, or use of an automobile).   Subsequently, in *South Carolina Farm Bureau Mutual Insurance Company v. S.E.C.U.R.E. Underwriters Risk Retention Group*, 347 S.C. 333, 554 S.E.2d 870 (Ct. App. 2001), *rev'd on other grounds*, 353 S.C. 249, 578 S.E.2d 8 (2003) [hereinafter *Farm Bureau*], the South Carolina Court of Appeals applied the Supreme Court's holding in *McPherson* to determine whether a business activities exclusion in a homeowners policy, similar to the one at issue in this case, precluded coverage.   *See id*. at 339–40, 554 S.E.2d at 874.

11

In *Farm Bureau*, Ralph and Mary Garrison owned a home, insured under a homeowners policy by South Carolina Farm Bureau Mutual Insurance Company ("Farm Bureau"). *Id*. at 337, 554 S.E.2d at 872. The Garrisons were also part-owners of a pest control business which was insured through a commercial general liability policy issued by S.E.C.U.R.E. Underwriters Risk Retention Group ("SECURE"). *Id*. at 337, 554 S.E.2d at 872–73. The Garrisons had a dog that they kept as a family pet and, frequently, Mrs. Garrison would bring the dog to the pest control business when she had nowhere else to leave it. *Id*. at 337–38, 554 S.E.2d at 873. "The dog did not serve any function associated with the business of general pest control or extermination." *Id*. at 338, 554 S.E.2d at 873. One day, a minor child was at the business premises of the pest control company with her parents when she was bitten by the Garrisons' dog. *Id*. at 337, 554 S.E.2d at 873. The child's parents brought suit against the Garrisons and the pest control company, and Farm Bureau filed a separate declaratory judgment action seeking a determination of whether it had any duty to defend or indemnify the Garrisons under their homeowners policy. *Id*. at 338, 554 S.E.2d at 873.

Although the Farm Bureau homeowners policy provided coverage for "a person off the insured location if the bodily injury 'was caused by an animal owned by or in the care of the insured[,]'" Farm Bureau argued that coverage for the dog bite was excluded because it fell under an exclusion for "'bodily injury . . . arising out of business pursuits of an insured or arising out of a premises owned by the insured that is not an insured location.'" *Id*. at 339, 554 S.E.2d at 873–74 (internal alterations omitted). The Court of Appeals disagreed, noting that, before an exclusion can be found to bar coverage, "'[a]n insurer must show a causal connection between [the] loss and [the] exclusion[,]'" *Id*. at 339, 554 S.E.2d at 874 (quoting *S.C. Ins. Guar. Ass'n v. Broach*, 291 S.C. 349, 351, 353 S.E.2d 450, 451 (1987)). In particular, the Court found persuasive the analysis

of the Missouri Court of Appeals in a similar dog bite case, which held, in pertinent part: "Liability for injuries caused by an animal owned by an insured arises from the insured's personal tortious conduct in harboring a vicious animal, not from any condition of the premises upon which the animal may be located." *Id*. at 340, 554 S.E.2d at 874 (quoting *Lititz Mut. Ins. Co. v. Branch*, 561 S.W.2d 371, 374 (Mo. App. 1977)).  Thus, "[u]tilizing the definition of 'arising out of' from *McPherson*, and the analysis from *Lititz*," the Court concluded that "the fact that the dog bite occurred on the business premises of Garrison Pest Control does not necessarily mean that it was 'caused by' the business pursuits or business premises.  Rather, the dog bit may have been caused by the alleged tortious conduct of bringing the family pet to the business premises." *Id*. Accordingly, the Court of Appeals affirmed the circuit court's conclusion that the Farm Bureau policy's business activity exclusion did not apply to the minor child's injuries and that Farm Bureau had a duty to defend and indemnify the Garrisons in the underlying lawsuit. *Id*.

Defendants rely exclusively on the Court of Appeals' decision in *Farm Bureau* to argue that, because the gun belonged to David, who "was not involved in the [babysitting] business and did not serve any function associated with the business[,]" but was merely a resident living in the Home, W.W.K.'s injuries were "not 'caused by' the babysitting business or by the business premises any more than the dog bite in . . . *Farm Bureau*[.]" (ECF No. 37 at 6).  However, the court finds that Defendants' reliance on *Farm Bureau* is misplaced.

As an initial matter, the facts in *Farm Bureau* are distinguishable from the case at hand.  In *Farm Bureau*, as the Court of Appeals noted, the conduct for which the Garrisons faced liability— the dog bite—was entirely distinct from their pest control business, with the only connection being that the injury occurred on the business premises.  *See Farm Bureau*, 347 S.C. at 340, 554 S.E.2d at 874.  The Court of Appeals explicitly "conclude[d] the fact that the dog bite occurred on the

13

business premises of Garrison Pest Control does not necessarily mean that it was 'caused by' the business pursuits or business premises[,]" but "[r]ather, the dog bite may have been caused by the alleged tortious conduct of bringing the family pet to the business premises." *Id*.

In this case, however, W.W.K.'s injuries and the claims asserted in the Underlying Action was inextricably connected to Lydia's babysitting business. Both Kuhn and Lydia testified that Lydia's responsibilities while providing these babysitting services included supervising, monitoring, and watching the children, and providing a safe environment for them. (ECF Nos. 32-3 at 8, 27; 32-8 at 8–9). The Complaint in the Underlying Action specifically alleges that, on August 1, 2016, Lydia was babysitting W.W.K. such that he was in her "care, custody, and control," and that Lydia, as well as David and Clark, were negligent, reckless, and grossly negligent in, *inter alia*, "failing to adequately and properly supervise [W.W.K.] while he was in the [H]ome[,]" and "failing to adequately protect [W.W.K.] from harm related to the presence of the firearm[.]" (ECF No. 32-2 at 2–3). Kuhn testified that, had Lydia properly done the job she was hired to do, by providing a safe environment and supervising W.W.K., he would not have been injured. *See* (ECF No. 32-8 at 7–10). Moreover, Lydia herself conceded that, "[*b]ut for* the fact that [W.W.K.] was [in the Home], *because [she] w[as] providing home daycare services*, he would not have come in contact with that gun." (ECF No. 32-3 at 27 (emphasis added)). Thus, contrary to *Farm Bureau*, there can be no question in this case that the claims asserted in the Underlying Action arise directly out of Lydia's alleged failure to provide the very services she advertised and for which Kuhn hired her. *See* (ECF Nos. 32-3 at 8, 26–28, 32, 33; 32-8 at 3–5, 7–10, 12; 37 at 4); *see also, e.g.*, *Am. Commerce Ins. Co. v. Few*, No. 10-CV-0036-CVE-FHM, 2010 WL 2595860, at *5 (N.D. Okla. June 24, 2010) ("Courts finding that no coverage exists for children's injuries sustained at in-home daycares have focused on the fact that the child was at the

home because of the daycare business, and the fact that the alleged tortfeasor owed a duty to the child because of the daycare business.  According to this line of reasoning, the victim child would not have been at the home, nor would the child have a tort claim, if it were not for the existence of the daycare business.  Courts have also focused on the actual cause of the injury, and determined that claims arising out of a daycare provider's negligent supervision were not covered, but claims based on breach of duties unrelated to the daycare were covered." (internal citations omitted)); *Econ. Premier Assur. Co. v. Fairfull*, Civ. A. No. 08-cv-082, 2010 WL 654484, at \*12 (W.D. Penn. Feb. 23, 2010) ("While under [insured's] care, [child] was bitten by a dog that was kept by the [insureds] on the same premises.  Under these circumstances there is a causal connection between [insured's] childcare business and the injury received while under her care at the . . . residence.  But for [the child] being on the premises to receive child care services, she would not have been bitten by the dog.  Therefore, [the child's] injuries 'arose from' [the insured's] business pursuits.  Finding that the underlying injuries arose from [the insured's] business pursuits means that the business pursuits exclusion applies to this case, precluding coverage." (internal citations omitted)); *Stanley v. Am. Fire & Cas. Co.*, 361 So. 2d 1030, 1033 (Ala. 1978) (holding that homeowners policy excluded coverage for injuries to minor child who fell onto hot coals in the fireplace while the insured, who was babysitting the minor, was making lunch because the insured's babysitting constituted a "business pursuit" from which the injuries arose and noting that the activity at issue was not the insured's preparing lunch, "but rather . . . the failure to properly supervise a young child").  Therefore, the claims asserted in the Underlying Action are clearly and unambiguously excluded from coverage under the Policy pursuant to the business activities exclusion.

### B.  Allstate's Duty to Defend and Duty to Indemnify

"Pursuant to South Carolina law, an insurer's duty to defend is determined by the allegations of the underlying complaint." *Union Ins. Co. v. Soleil Grp., Inc.*, 465 F. Supp. 2d 567, 572 (D.S.C. 2006).  Thus, the court must perform a comparison of the relevant policy provisions with the allegations in the underlying complaint.  *See USAA Prop. & Cas. Ins. Co. v. Clegg*, 377 S.C. 643, 655, 661 S.E.2d 791, 797 (2008).  "If the facts alleged in the complaint [against an insured] fail to bring a claim within the policy's coverage, the insurer has no duty to defend." *Collins Holding Corp. v. Wausau Underwriters Ins. Co.*, 379 S.C. 573, 577, 666 S.E.2d 897, 899 (2008) (citing *S.C. Med. Malpractice Liab. Ins. Joint Underwriting Ass'n v. Ferry*, 291 S.C. 460, 463, 354 S.E.2d 378, 380 (1987)).  "'[A]n insurer has no duty to defend an insured where the damage was caused for a reason unambiguously excluded under the policy.'"  *Clegg*, 377 S.C. at 655, 661 S.E.2d at 797 (quoting *B.L.G. Enters., Inc. v. First Fin. Ins. Co.*, 334 S.C. 529, 535, 514 S.E.2d 327, 330 (1999)).

As discussed above, the Complaint in the Underlying Act explicitly alleged that W.W.K. was injured while "in the care, custody, and control of [Lydia], who was babysitting [him]," (ECF No. 32-2 at 2), and the claims asserted therein are barred from coverage under the business activities exclusion.  Accordingly, Allstate has no duty to defend Lydia, David, or the Estate in connection with the Underlying Action.[3]

---

[3] The court notes that, although the W.W.K.'s injuries and subsequent claims arose from Lydia's babysitting business, the policy does not limit application of the exclusion only to the insured whose business activities cause the injury. *See* (ECF No. 32-3 at 79).  Rather, the policy excludes from family liability protection coverage any "bodily injury . . . arising out of the past or present business activities of an insured person." *Id*.  The claims in the Underlying Action are brought against Lydia, David, and the Estate, jointly and severally, and all arise out of Lydia's alleged failure to properly supervise and care for W.W.K. *See* (ECF No. 32-2).  Therefore, coverage is barred, not only for Lydia, but for David and the Estate as well. *See, e.g.*, *S.C. Farm Bureau Mut. Ins. Co. v. Kelly*, 345 S.C. 232, 240–41, 547 S.C.2d 871, 875–76 (Ct. App. 2001) (holding that insured's son, who lived in the residence, qualified as an insured person and, because his conduct fell within the exclusion for intentional loss, coverage was barred as to all insureds).

Additionally, the joint obligations provision provides that "the responsibilities, acts and failures to act of a person defined as an insured person will be binding upon another person defined as an insured person." *Id*. at 63.

Furthermore, having found that Allstate has no duty to defend, the court also concludes that Allstate has no duty to indemnify Lydia, David, or the Estate under the Policy. *See, e.g.*, *Canopius U.S. Ins., Inc. v. Middleton*, 202 F. Supp. 3d 540, 546 (D.S.C. 2016) ("If an insurer has no duty to defend, it necessarily has no duty to indemnify . . . ."); *Am. S. Ins. Co. v. Moras Roofing, LLC*, No. 2:09-cv-1966, 2010 WL 2710588, at \*3 (D.S.C. July 7, 2010) ("If Plaintiff has no duty to defend . . . in the pending state court action . . . it will know it does not have a duty to indemnify.").

## CONCLUSION

Accordingly, for the reasons set forth herein, Allstate's motion for summary judgment (ECF No. 32) is **GRANTED**.[4]  The court, therefore, **DECLARES** that there is no coverage under the Policy for the claims asserted in the Underlying Lawsuit and Allstate has no duty to defend or to indemnify Lydia, David, or the Estate in connection with those claims.

**IT IS SO ORDERED.**

s/Timothy M. Cain
United States District Judge

Anderson, South Carolina
November 24, 2020

---

Clark is the named insured on the Policy, and it is undisputed that both Lydia and David are her relatives and resided in the Home on August 1, 2016, such that they qualify as insured persons. *See* (ECF No. 32-3 at 61).  Thus, under the joint obligations provision, Lydia's business activities are binding upon David and the Estate and coverage is precluded for them as well as Lydia. *See, e.g.*, *Allstate Vehicle & Prop. Ins. Co. v. Hunter*, 425 S.C. 246, 248, 821 S.E.2d 493, 494 (2018) (answering certified question and holding that "[t]here is nothing in [the precedent] or in the public policy of this State that would alter the district court's conclusion [that] 'the [Hunter] policy unambiguously denies coverage to [Rose Hunter] where [Joseph Hunter] has been barred from coverage.'"

[4] In light of the court's ruling, the court declines to address the additional grounds advanced by Allstate in support of its motion.